**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

ALISON KOHLER,                        :
                    **Plaintiff,**    :
                                      :
        v.                            :        **1: 17-cv-07839-ALC**
                                      :        <u>**OPINION AND ORDER**</u>
**FEDERAL EMERGENCY MANAGEMENT**      :
**AGENCY, ET AL.,**                   :
                                      :
                    **Defendants.**   :
                                      :
-------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: ___4/2/2021_____

**ANDREW L. CARTER, JR., District Judge:**

The Court now considers a Motion for Summary Judgment by Defendant Federal Emergency Management Agency, together with individual defendants.[1] In April 2015, Plaintiff Alison Kohler was terminated from a public relations role at FEMA that she had begun in February 2014. Kohler alleges that during her FEMA tenure she endured a hostile work environment based on her gender, in violation of Title VII; was terminated in retaliation for opposing discrimination against her visually impaired colleague, in violation of Title VII; suffered gender discrimination, in violation of Title VII; was terminated in violation of the Whistleblower Protection Act of 1989; was improperly denied review of her termination by the Merit System Protection Board ("MSPB") pursuant to the Civil Service Reform Act of 1978 and the Civil Service Due Process Act of 1990 (together, the "CSRA"); and was otherwise denied due process rights in relation to her termination. FEMA counters that Kohler's termination was based on documented poor performance, rather than gender discrimination or retaliation. FEMA also denies that Kohler engaged in whistleblowing

---

[1] Along with the FEMA, the following are named as Defendants: Michael Bresnahan, Deputy Regional Administrator, in his Official and Individual Capacities; Terence Hoey, Law Enforcement Liaison, in his Official and Individual Capacities; Donald Caetano, External Affairs Director, in his Official and Individual Capacities; Kristjien Nielsen, Secretary, in her Official and Individual Capacities; Jeff Sessions, Attorney General of the United States; U.S. Department of Justice/ U.S. Office of Special Counsel. Title VII does not provide a cause of action against individuals, *see Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012); therefore claims against all individual defendants are dismissed.

activities at all. It also maintains that her termination is not reviewable by the MSPB and does not give rise to a due process claim.

Upon careful consideration, the Court concludes that FEMA is entitled to summary judgment on all of Kohler's claims. As to the retaliation claim, Kohler fails to demonstrate a prima facie case of retaliation or show that FEMA's legitimate, non-discriminatory reason for terminating her was pretextual. As to the hostile work environment claim, Kohler has not shown that the environment at FEMA was subjectively or objectively hostile, nor that the incidents allegedly constituting the hostile environment were based on Kohler's gender. For similar reasons, Kohler's gender discrimination claim is also not viable. Kohler also fails to show that she engaged in any protected disclosure within the meaning of the Whistleblower Protection Act. The Court further concludes that the MSPB does not have jurisdiction over the appeal of Kohler's termination because, given her temporary appointment to FEMA, she was not an employee within the meaning of the CSRA. Finally, the Court concludes that Kohler failed to show any basis on which she may have a property interest in her position at FEMA, such that she was entitled to due process.

BACKGROUND

Defendant FEMA is a federal agency that is responsible for, among other things, administering and coordinating the federal governmental response to Presidentially-declared disasters pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42 U.S.C. §§ 5121 *et seq*.

Plaintiff Alison Kohler worked at FEMA as a Public Relations Specialist in their External Affairs Department from February 2014 to March 2015. The "primary purpose" of Kohler's position was "to serve as a team lead and senior advisor to the Regional External Affairs Division

Director on public information, strategic messaging, congressional relations, and intergovernmental affairs involving the development and delivery of both emergency and non-emergency information programs to state and local government officials, the general public, the news media, Members of Congress and their staffs, the emergency management community, government and business associations and organizations, and other target groups." 56.1 Reply ¶ 17. Accordingly, Kohler coordinated with program specialists and others at FEMA to get appropriate messaging, information, and support to congressional and state government officials and the public.

Kohler alleges, and FEMA disputes, that she was subject to a hostile work environment based on her gender and was retaliated against for engaging in formal and informal protected activity by complaining about alleged discrimination against a visually impaired co-worker, James Flemming. It is undisputed that throughout Kohler's tenure at FEMA her co-workers and external stakeholders, such as Congressional staffers, expressed concern about Kohler's demeanor; her coordination with other portions of FEMA, such as those with expertise in the execution of FEMA programs; her conveying inaccurate, off-message or extraneous information; and Kohler otherwise overstepping her role.

1. Kohler Joins FEMA

On December 9, 2013, Donald Caetano, FEMA Region II[2] Director for the External Affairs Division ("EA"), selected Kohler for the position of Lead Public Affairs Specialist. This was a position as a Cadre of On-call Response/Recovery Employee ("CORE") and was so advertised. 56.1 Reply ¶ 4. The Vacancy Announcement "FEMA-13-LN-15731CORE" stated:

---

[2] FEMA Region II covers New York, New Jersey, Puerto Rico, and the U.S. Virgin Islands. Reply 56.1 ¶ 16

> This position is being announced under FEMA's CORE Program (Cadre of On-call Response/Recovery employees). These positions are authorized under P.L. 93-288 to perform temporary disaster work and are funded from the Disaster Relief Fund. *Appointments are excepted service, temporary appointments. This is a 2-year temporary appointment in the Excepted Service.*

56.1 Reply ¶ 4 (emphasis added). Unlike permanent, full-time employees, Stafford Act Employees ("SAEs") do not enter FEMA through a competitive, merit-based hiring process and therefore do not acquire competitive status through their employment.

On January 28, 2014, Kohler received an Offer Letter that stated, in part, "[w]e are pleased to confirm your Temporary Appointment to the position of Public Affairs Specialist . . ." 56.1 Reply ¶ 6. On February 9, 2014, FEMA appointed Kohler as "CORE[3] Lead Public Affairs Specialist" via a Standard Form 50 ("SF-50"). 56.1 Reply ¶ 8. The SF-50 also indicated that the appointment was not to exceed 2 years and would therefore expire on February 8, 2016. 56.1 Reply ¶ 9. The "legal authority" listed for Kohler's Appointment was Public Law 93-288, known as the Stafford Act, 42 U.S.C. §§ 5121 *et seq*. 56.1 Reply ¶ 10. The SF-50 also specified that the reason for the temporary appointment is because the Lead Public Affairs Specialist is "a 2 YEAR CORE" position. 56.1 Reply ¶ 11. On February 10, 2014, Kohler signed her Appointment Affidavit, identifying the position to which she was appointed as "CORE LEAD EA Officer." 56.1 Reply ¶ 12. Kohler started her employment with FEMA in February of 2014.

---

[3] CORE is an internal FEMA designation for temporary employees. The Conditions for Employment for CORE employees states: "I understand that this is a temporary civil service excepted service position that does not confer eligibility or priority consideration for permanent appointment. I may be terminated at any time, with cause (*e.g.*, poor performance or misconduct) or without cause (*e.g.*, downsizing of workforce, change in program direction or operational needs). My appointment will neither help nor hinder my chances for permanent appointment. . . . I may be released from an assignment at any time and with little or no notice based on the needs of the operation. In addition, I understand that I may be placed in a non-duty, no-pay status at any time (*e.g.* due to downsizing of the workforce or change in program direction) and may be terminated at any time for cause (*e.g.* poor performance or misconduct) and that I am not subject to any protection afforded by reduction-in-force provisions, re-employment rights or adverse action procedures established under any statutory or regulatory provision . . . . I understand that my appointment will end on the Not to Exceed (NTE) date of my appointment, unless it is extended based on the needs of the Agency." Reply 56.1 ¶ 14.

2.                 Alleged Hostile Work Environment Based on Gender

Kohler alleges that during her tenure at FEMA she was subject to a hostile work environment based on her gender. The occurrence of the acts and statements Kohler contends created a hostile work environment is in dispute.

Kohler testified that Caetano told her a former FEMA employee who was on a "Be On The Lookout Poster" had "flashed his dick or something." 56.1 Reply ¶ 200. Kohler testified that Caetano told her another male employee was accused of propositioning a couple to "swing" with that male employee. 56.1 Reply ¶ 201. She also testified that Caetano told her he was uncomfortable with an openly gay employee serving as Santa Claus at a holiday party and that a FEMA employee looked like a "child molester." 56.1 Reply ¶¶ 202, 204. Kohler also testified that while she and Caetano were on a work trip to St. Thomas, Caetano urinated next to an open driver's side door while Plaintiff was sitting in the passenger's seat. 56.1 Reply ¶ 205. Kohler also alleges that Caetano referred to the region's headquarters staff as "idiots" in emails with her, ECF No. 45-8 at 49:19-50:3, and said that lazy reporters "piss him off", ECF No. 45-8 at 51:10-21. She also alleges that he "commented to Plaintiff on the physiques of female employees." Opp. at 33. As alleged in the complaint, Caetano expressed surprise that one employee was designated health coordinator instead of another "fit" employee. ECF No. 12 ¶ 51.

When asked about the impact of these incidents, Kohler testified that they "solidified" her poor opinion of Caetano and caused her to have less respect for him. ECF No. 45-8 at 50:10-51:9 (idiots comment); 51:21-52:16 (reporter comment); 52:2353:12 (flashing comment); 53:13:54:20 (swinging comment); 54:21-56:18 (Santa Claus and child molester comment). However, she did not testify that they otherwise impacted her work. Kohler testified that the urination incident did not interfere with her work performance. Rather, she "felt like [Caetano] was a former Marine,

probably someone who is crass and does inappropriate things thinking they're not so inappropriate." ECF No. 45-8 at 39:12-19.

In addition, Kohler alleges discrimination in the form of gendered expectations at work. Kohler testified that Caetano asked Plaintiff to "take a softer approach and to try to get in good with co-workers to get favors from them when she needed them." 56.1 Reply ¶ 193. When Kohler asked if he meant that she should be more flirtatious, Caetano replied "I don't want to say that." 56.1 Reply ¶ 195. Kohler testified that she believed a "softer approach" and "ingratiating" was "depicting [] a female in, sort of, light banter, joking, compliments to someone, so that they will respond how she might want them to." ECF No. 45-8 at 47:25-48:15.

Kohler also testified to allegedly discriminatory statements by Michael Bresnahan, her secondary supervisor who is senior to Caetano, and Linda Baldry, a co-worker. On December 21, 2014, Kohler sought Bresnahan's advice regarding concerns that Caetano might fire her. Plaintiff testified that during that conversation Bresnahan told her that when women are assertive, they get labeled, but when men are assertive, they do not get the same label. 56.1 Reply ¶ 192. Kohler also testified that she asked Baldry to review an email she had sent because the recipient's reply to her had been cold. Baldry said that if she had been on the receiving end of Kohler's email, her reaction would have been: "Who the fuck does this girl think she is." ECF No. 45-8 at 40:15-20. When Kohler asked Baldry why she would have that reaction, Baldry replied that it was "because [Kohler] ha[d] no disaster experience or experience in public assistance" and should "plant" her ideas with someone with "credibility in the agency and then – then it will basically get done." ECF No. 45-8 at 40:21-41:1-9. When asked if the comment was made because Kohler was a young woman, Baldry said no. ECF No. 45-8 at 41:10-18. Kohler testified that this incident "upset" her,

but when asked if it affected her work going forward, Kohler testified that "it didn't change." ECF No. 45-8 at 44:20-45:8.

### 3.   Alleged Protected Activity and Kohler's Performance

Kohler also contends that she was retaliated against for engaging in protected activity by making informal and formal complaints that a disabled colleague, James Flemming, was being mistreated by another colleague, Terrence Hoey. Kohler's alleged protected activity occurred at an October 28, 2014 meeting with Hoey and by way of Equal Employment Opportunity counseling that began as early as December 18, 2014. Before and after that time, Kohler received negative feedback on her job performance inside and outside of FEMA. Because the timing of this criticism is central to whether Kohler indeed states a claim for retaliation, the Court sets forth the chronology of Kohler's protected activity and performance complaints below.

### a.   February 2014 - Kohler's Training Period with Sue Carlson

Prior to Kohler beginning her position, Sue Carlson, FEMA Region II External Affairs Officer, temporarily filled the role. ECF No. 45-12 at 15:16-16:8. Though Carlson was supposed to train Kohler for "at least a couple of months[, the training] lasted about a day" because, according to Carlson, Kohler "did not accept the fact that she needed training." 56.1 Reply ¶ 19. Carlson testified that she received emails from Kohler characterized by "[d]isrespect, inappropriate communication, negative attitude, resistance, [and a] condescending tone." ECF No. 45-12 at 26:5-8. Carlson also testified that she was "traumatized" by her time working with Kohler, which ended in approximately May 2014. ECF No. 45-12 at 17:12-14, 23:25-24:13.

### b.   June 25, 2014 - Scheduling Incident with Catherine Belfi

Kohler worked with Catherine Belfi, who served as both the Regional Deputy Attorney and the Acting Public Assistance Branch Chief. 56.1 Reply ¶ 20. Around June 25, 2014, Kohler

scheduled a meeting with the office of Senator Kirsten Gillibrand without confirming the date and

time with Belfi. 56.1 Reply ¶ 21. Belfi emailed Kohler:

> The email that I received last week about this call only confirmed that you would arrange
> participation on our end. You copying me on an email out to external parties trying to
> coordinate their availability two days before a call is scheduled is not arranging
> participation - it is painting us into a corner especially given that we have no clear agenda
> for the call . . . . [I]n instances like this I ask that you please confirm the intended agenda
> for calls like this so that we can give you a realistic time frame for getting the information
> and actually coordinate with the necessary parties internally before you been [*sic*]
> coordinating externally. If we don't do either of those things, we end up in situations like
> this where we all look bad.

56.1 Reply ¶ 23.

> After that incident, Caetano emailed Kohler:

> You and I likewise need to have a frank discussion too because there are a few
> issues that need to be fleshed out. We'll have a face to face on Friday in my office.
> I need to be clearer on my expectations because had I been so before, this situation
> may very well have been avoided. I'll take that one on the chin as the director. I
> didn't clarify what I wanted to happen when I should have. As your mentor, DD
> and supervisor, I owe you that. I can't hold you to a standard that I haven't properly
> articulated. I promise I will do that on Friday so you understand what I expect of
> you.

56.1 Reply ¶ 21.

### c. *Undated Meetings with Caetano Regarding Complaints*

Though the record is not clear on exact dates, it is undisputed that Caetano had meetings

with Kohler in which he conveyed complaints from inside and outside FEMA about her demeanor

prior to the October 28, 2014 meeting with Hoey. Kohler described several such meetings in an

undated memorandum. ECF No. 45-5 at 19-25. For example, Kohler recounted:

> My boss called me into his office once or twice to say that someone had come in to
> complain about me. He rolled his eyes along with me and said that he had told them, 'He
> didn't want a wallflower in my job' and he wanted me to do exactly what I was doing. But
> then he asked me to 'soften my approach' and ingratiate myself with them before asking
> them to do what I needed. I said I didn't think I should have to manipulate them to do what
> is already their jobs. I also said that I didn't think people should be able to pick and choose

who they worked with based on whether or not they 'liked' you. I saw it that we all had jobs to do, and I was doing mine and their problem was not with me but instead with me uncovering that they might not be doing theirs.

ECF No. 45-5 at 20.

Kohler described another:

Another time he called me in to say that people were complaining that I was showing them up and moving too fast for their liking. He told me to slow down a bit and try not to outshine others. I asked if he was directing me to lower my standards so others would feel better instead of telling others that the bar is high and they should strive to achieve it as well. He said in this culture, yes, he needed me to tone it down and not be so pushy and try to move things toward resolution so fast.

ECF No. 45-5 at 20-21.

Kohler described still another instance in which Caetano conveyed criticism regarding her demeanor. This time, Kohler perceived Caetano to be not "on her side":

About six or eight months in, my boss began calling me in to tell me that someone complained about 'my style' and when I asked who he said he wouldn't name names. When I asked specifically what was the situation that caused them to complain about me, he said he wasn't going to give me specifics. I explained that without much to go on, I didn't see what adjustments I could make, because I had no idea what the problem was. I told him no one ever came to me to say I offended them or that they found me off-putting and that I was genuinely surprised that they came to him. He wasn't rolling his eyes along with me or telling me that he had sided with me now. He was telling me that I was causing him grief by having 'lines of people' outside his office to complain about me. Still, he offered no specifics about who and why—except they didn't like my style.

ECF No. 45-5 at 21.

To be sure, some details of these meetings may be in dispute. The important point is that the record is clear that complaints were surfacing about Kohler's demeanor prior to October 28, 2014, and Caetano's patience was shortening as these complaints continued to arise.

    d.   *October 28, 2014 Meeting with Terrence Hoey – Alleged Protected Activity*

James Flemming, who is visually impaired, was a colleague of Kohler in the External Affairs department. He worked with another FEMA employee, Terrence Hoey, on a project called the "Blue Campaign", an anti-human trafficking campaign. ECF No. 45-8 at 62:3-11. Sometime in October, Flemming was directed by Hoey to retract an email sent about the Blue Campaign because it was "non-compliant." 56.1 Reply ¶ 34. Flemming asked Kohler to assist him with re-issuing the email. ECF No. 45-8 at 78:20-80:19. Kohler agreed to assist Flemming, noting that Hoey should "appreciate" Flemming getting the word out and not complain about the content of the email. ECF No. 45-8 at 78:20-80:19. Flemming said that he felt intimidated or browbeaten by Hoey; Kohler agreed he could be a bully. ECF No. 45-8 at 78:20-80:19

Kohler, who was not present at the exchange, admits that she is not aware of Hoey making any comments about Fleming's disability when ordering the recall of the email. 56.1 Reply ¶ 35. However, she testified at her deposition that she understood the non-compliant portion of the email to have been caused by limitations of Flemming's screen reader. 56.1 Reply ¶ 34. Flemming also told Kohler about one occasion on which Hoey made fun of Flemming's use of a cane, which he relied on due to his visual impairment. 56.1 Reply ¶ 215.

On October 28, 2014, Kohler had a meeting with co-workers Terrence Hoey and Julie Blanciak. 56.1 Reply ¶ 27. The meeting was contentious. Kohler, who recorded and transcribed the meeting, sent a summary email to Flemming. 56.1 Reply ¶¶ 28-29. The email stated:

> I said to be honest I was not at the meeting as your supervisor but instead because I felt like he was a bully and wanted to stand up for people who may not have the nerve to do so. He cut me off and walking out told me to put that in writing. He said I was not to have anything to do with the Blue Campaign, and I said, that's the issue. You don't have authority over me…and don't threaten me.

56.1 Reply ¶ 29. It is undisputed that Kohler never referred to Flemming's disability during the meeting.

Kohler discussed her opinion that Hoey was a bully with Caetano. 56.1 Reply ¶ 32. It is undisputed that Kohler did not tell Caetano that Flemming was being discriminated against on the basis of his disability. 56.1 Reply ¶¶ 31, 32, 37. Kohler admits that she told Caetano that Hoey was a bully and that Flemming was an object of intimidation, but did not otherwise indicate he was bullied based on his disability. 56.1 Reply ¶ 37. Flemming himself mentioned his disability in an email responding to Kohler's recap of the October 28, 2014 meeting, on which Flemming cc'd Caetano. Kohler's email to Flemming stated, in relevant part:

> I met with Terry Hoey and Julie Blanciak was there too. It went as expected. He wanted to skip past the events that could be improved on and tell me to use the release he and Rob provided and all problems would be solved. I explained that I found the release you used to be certainly acceptable--even better--and I didn't understand why it had to be retracted. I asked for an example of what was inaccurate, wrong, in error, and he said that it went against his directive that no communication on the campaign would deviate from the content that was on the website.

ECF No. 48-2 at 3. Flemming wrote in reply:

> By the way, at no time did [Hoey] tell me that all materials had to incorporate doctrine in the web site. [Hoey] has never, ever communicated with me about guidelines on the Blue campaign. When he has communicated with me, he has brow beaten me, ordered and pushed me around, and chosen to be verbally and in his emails be nasty and hostile. *He has publicly humiliated and degraded me as well in the past by calling attention to my disability as if his comments were some joke*.

ECF No. 48-2 at 3. (emphasis added); 56.1 Reply ¶ 32.

On November 13, 2014, the American Federation of Government Employees ("AFGE") Local 2203 filed a union Grievance with Caetano concerning Kohler's conduct during the October 28, 2014 meeting, alleging that she engaged in unprofessional conduct and made unsubstantiated allegations against Hoey during that meeting. 56.1 Reply ¶ 42.

11

That same day, Kohler emailed Caetano a statement with a transcript of the October 28, 2014 meeting. ECF No. 45-4 at 77. Neither the transcript nor email mention discrimination against Flemming based on his disability.

On November 20, 2014, Blanciak sent Caetano an email describing the October 28, 2014 meeting. 56.1 Reply ¶ 60. Blanciak stated that, from what she observed, Kohler attended the meeting with the intention of confronting Hoey regarding behavior she considered "bullying" and that when [Kohler] was asked about her role, Kohler "directly stated that she was addressing a pattern of bullying that she had observed." 56.1 Reply ¶ 61. Blanciak reported that she "felt very uncomfortable during this exchange and felt that [Kohler's] comments to Hoey were inappropriate and unprofessional." 56.1 Reply ¶ 61.

### e. October 30, 2014 - Email Incident with Steven Ward

On October 30, 2014, Kohler emailed Steven Ward, Acting Response Director, FEMA Region III, and copied Caetano and Belfi, among others, regarding possible relief for a New York location, Camp Good Days. 56.1 Reply ¶ 39. In her email she stated that she spoke with Kelsey LaFreniere, Legislative Correspondent for Senator Chuck Schumer, and when Ms. LaFreniere asked about a decision on Camp Good Days, Kohler stated, "I told her it was a critical PNP pending one last piece of substantiating information." 56.1 Reply ¶ 39. Belfi sent Kohler a reply asking, "[y]ou told them it would be a critical pnp? . . . [t]hat's not accurate." 56.1 Reply ¶ 39. Kohler alleges that she informed Belfi that she fixed the matter, to which Belfi replied "Great thanks." 56.1 Reply ¶ 39.

### f. November 3, 2014 - Email Incident with Belfi

Around November 3, 2014, Kohler sent a draft document to FEMA headquarters. 56.1 Reply ¶ 40. Belfi sent an email to Kohler and others indicating that the document was not final and

should not have been sent to FEMA, saying Belfi "expected . . . more discussions and review before a pdf of the document went to HQ." 56.1 Reply ¶ 40.

> g. *November 4, 2014 – Stefanie Lineburg recommends performance expectations memo*

On or about November 4, 2014, Stefanie Lineburg, a FEMA Human Resources Specialist, visited FEMA Region II and met with Caetano regarding discipline for Kohler due to complaints that Caetano received about "the way [Kohler] talked to people." 56.1 Reply ¶ 41. Lineburg suggested that Caetano issue Kohler a performance expectations memo. 56.1 Reply ¶ 41.

> h. *November 14, 2014 – Email Incident with Office of Congressman Tom Reed*

On November 14, 2014, Kohler sent an email regarding Camp Good Days to Lee James, Constituent Specialist for Congressman Tom Reed, copying Richard Lord, Chief of Mitigation Programs & Agency Preservation Officer, New York State ("NYS") Division of Homeland Security and Emergency Services ("DHSES"), and Kristin Devoe, Public Information Officer, NYS DHSES. 56.1 Reply ¶ 43. Kohler provided James with information to prepare for a meeting with officials from Camp Good Days. 56.1 Reply ¶ 43. Devoe forwarded the email to other NYS DHSES officials, Christopher Holmes, Andrew Feeney, and Richard Lord. 56.1 Reply ¶ 44. Holmes, in turn, forwarded the correspondence to Seamus Leary, FEMA Federal Coordinating Office asking Leary to "get [Kohler] to clear and coordinate her answers directly with the joint team at the JFO before she sends anything out" and "direct her to stop providing this level of detail directly to the Congressman's representative" because it "is not helpful." 56.1 Reply ¶ 46. Holmes complained, among other things, that Kohler was "getting [FEMA] 'entwined in what should be internal decision making processes for the applicant,' was 'adding to the load on what already been an overthought process,' and that '[e]very time she does this it costs [the state] time and money.'"

56.1 Reply ¶ 47. Holmes additionally stated that "…this is NOT an area [Kohler] needs to be wading into." 56.1 Reply ¶¶ 47, 49. Feeney subsequently forwarded Holmes's email to Caetano, stating "Don: this is out of control. Alison does not coordinate well with the State. We have never seen anything like this before." 56.1 Reply ¶ 51.

Lord sent two further emails among the state officials regarding Kohler's performance. On November 14, 2014, he emailed Devoe, Feeney, and Holmes stating that this was "not the first time [Kohler's] skewed our program information" and referencing Kohler giving incorrect information to the office of Senator Gillibrand. 56.1 Reply ¶ 52. On November 15, 2014, Lord sent a separate email to Holmes stating "this isn't a one-time thing", referring to a prior incident where Kohler provided incorrect information and Lord believed she "tried to save face with a second inaccurate note." 56.1 Reply ¶ 53. Steve Ward, from FEMA, forwarded these email chains to Caetano. 56.1 Reply ¶ 54.

On November 16, 2014, Caetano forwarded the chain to Kohler and stated: "As I mentioned on Friday, we need to sit down and talk about this when you return. Being proactive is generally a good thing, but we need to be accurate as well. The state is livid right now." 56.1 Reply ¶ 55. On November 17, 2014, Caetano emailed Lord, Feeney, Holmes, and William Nechamen, and stated that their concerns regarding Kohler were "valid" and that he would "certainly address the situation so we don't have the same issues again going forward." 56.1 Reply ¶ 58. Ward was copied on the email and responded: "[U]nfortunately, I think NYS has formed their opinion of Alison and she will not be able to shake it." 56.1 Reply ¶ 59.

     i.   *December 1, 2014 – Kohler's call with the Office of Senator Gillibrand*

On December 1, 2014 Kohler had a call with a staffer in the Office of Senator Kirsten Gillibrand regarding several open projects, which Kohler memorialized in an email to Caetano that same day. Kohler summarized the call, in relevant part:

> She called me this afternoon and wanted to know about the appeals. Unfortunately I had to report that they're still under review. She asked about our staffing and turnover (previous issued [*sic*] noted over the summer) and I advised that we do have a new Division Director and Deputy on board and the branch chief position is being actively recruited. She asked why the Irene and Lee disaster got so behind, and I told her I didn't know except that we did inherit more residual work at the Region than we're typically resourced to handle.

ECF No. 45-4 at 101. Kohler also wrote that she was asked "how many appeals do you have in [Region II]?", which she answered: "Over 200 but that includes all previous disasters and even Sandy and newer, because all First Appeals go to Region." ECF No. 45-4 at 49. After summarizing further discussion on ongoing improvements at FEMA, Kohler indicated that she had sent Caetano the summary because she "d[id]n't think this is the last of the conversation." ECF No. 45-4 at 50.

### j. December 9, 2014 - Kohler Meets with Caetano

Kohler met with Caetano on December 9, 2014 to discuss performance concerns. 56.1 Reply ¶ 63. During the meeting Caetano advised Kohler that "some reps from New Jersey. . . had taken issue with a question [Kohler] answered to a staffer of Senator Bob Menendez's office" and that Kohler was "persona non grata" in both New York and New Jersey. 56.1 Reply ¶ 64.

### k. December 10, 2014 – Kohler reaches out to Bresnahan

On December 10, 2014, Kohler emailed Bresnahan to express concerns about Caetano. She forwarded Bresnahan an email she had sent Caetano objecting to Hoey having a meeting regarding his prior grievance without her present. Though the record is not clear regarding the exact status of the grievance at that time, Kohler's email to Caetano suggests that Hoey's grievance was resolved not in his favor:

> I already feel like the [Regional Administrator] taking a meeting on this without me there is not in my best interests. Sure, everyone has a right to complain, but it was heard and decided, so why allow [Hoey] to continue to make these allegations to a broader and more influential audience? Just because he didn't agree with the answer to his grievance doesn't mean he should get more bites at the apple. What can I do to try to get him to stop making these baseless allegations to anyone he can find?

ECF No. 45-4 at 40. Kohler wrote to Bresnahan: "I raised this issue with Don [Caetano] Monday, and he informed me yesterday that the meeting will proceed as planned. He also stated that while this situation won't have any bearing on my performance appraisal, the other complaints he has received about me likely will." ECF No. 45-4 at 39. Kohler also wrote to Bresnahan that Caetano said "he 'doesn't want to have to terminate [her]' but there are now two states where [she is] 'persona non grata' and he doesn't know what else he can do when so many people refuse to work with [Kohler]." ECF No. 45-4 at 39. Kohler also wrote that while she was interested in a transfer, she did not "trust [Caetano] to negotiate a fair reassignment for [her], because [she was] afraid he w[ould] present [her] as a problem employee to take off his hands, and [she] w[ould] start off at a disadvantage in trying a different role and environment." ECF No. 45-4 at 39.

That same day, Kohler also sent a draft email to her spouse, Joshua Kohler, addressing Caetano, wherein Kohler: (1) stated that she was hurt to learn that there was "such disdain for working with [her];" (2) stated she could see why she would be considered "persona non grata" when internal customers felt slighted; (3) stated that she regretted that "so many people" voiced their concerns about her to Caetano; (4) stated "I do recognize that the role I'm in is not necessarily one that is the best for me;" (5) stated that she struggled with balancing stark competing interests in EA; (6) stated that she realized that while her performance was valued, "the way [she] get[s] there is the problem;" (7) acknowledged that "people don't like [her] style" and that her "instinct is to point out their insecurity or shortcomings;" (8) acknowledged that she "damaged relationships

with the States, Susie, Phyllis, Steve, PA [('Public Assistance')] or others"; (9) stated that she was "willing to apologize and meet with anyone who is willing to discuss why the relationship is damaged;" and (10) expressed her apprehension with staying in FEMA Region II because her "reputation with the States and within Recovery, Mitigation and Grants make those options untenable." 56.1 Reply ¶ 65.

*l.   December 11, 2014- Performance Expectations Memo*

On December 11, 2014, Caetano issued Kohler a Performance Expectations Memorandum, which stated that he had repeatedly counseled her on areas of her performance requiring improvement based on comments and complaints he received. 56.1 Reply ¶ 66. The Performance Expectations Memorandum stated that Kohler: "(1) failed to submit reports in a timely fashion; (2) overstepped her role by inappropriately responding to program-specific constituents without confirming the substance of her response with the relevant program office; (3) failed to exercise proper judgment as to when to defer to subject matter experts in responding to inquiries, sometimes resulting in incorrect or inaccurate information being relayed to applicants and grantees; and (4) had difficulty in exercising diplomacy in her demeanor when interacting with stakeholders and colleagues." 56.1 Reply ¶ 67. It also stated that "any additional performance concerns may result in administrative action." 56.1 Reply ¶ 69.

Kohler made a written response to the Performance Expectations Memorandum. She stated, "I have a value of honesty, which I interpret to be sharing facts, context, and implications without substantial regard as to whether it is favorable to FEMA, the State, the Locals or Member of Congress." 56.1 Reply ¶ 70. Kohler also admitted that her "abrupt and direct" language could be received poorly by coworkers but that she "truly adopt[s] the adage of treating others how [she likes] to be treated." 56.1 Reply ¶ 71. Kohler also stated: "I value candor and directness, so I tend

to use direct and concise communication to avoid what I consider to be 'fluff' or 'sugar coating.'" 56.1 Reply ¶ 71.

> m. *December 18 and 19, 2014 – Meetings regarding the December 1, 2014 Call with Senator Gillibrand's office*

On December 18, 2014, Kohler met with Caetano to discuss issues FEMA Headquarters Congressional Affairs had raised about her December 1, 2014 call with Senator Gillibrand's office. ECF No. 45-4 at 86. In an email recapping the call, Kohler wrote that she "asked if [Headquarters] perceived [she] had botched how [she] handled it, and [Caetano] said they didn't think [Kohler] should have 'pulled back the curtain so much' and they didn't understand why the Senator's office would be interested in 'how the sausage is made.'" ECF No. 45-4 at 86.

Kohler attended a meeting with Caetano and officials from Headquarters, James Nelson and Andrew Blaylock, the next day. Kohler summarized the meeting, in part:

> Mr. Caetano stated that it's important to make sure our stakeholders are getting the same information regardless of whether they ask the program experts, the regional congressional liaison or a headquarters congressional liaison, and Mr. Nelson said they should always get the same information because we provide the truth. Mr. Caetano said something to imply it's our role to quiet discord among Congressional staffs and Mr. Nelson said it's important to 'hold the line' and 'at the end of the day, as External Affairs, we work for the program and we take the arrows from the front office'.

ECF No. 45-4 at 86.

> n. *Late December EEO Complaint* EEO Counseling

On either December 18 or 22, 2014, Kohler reached out to Mary Swann, an EEO Specialist at FEMA, to initiate an EEO complaint alleging discrimination and retaliation by Caetano based on incidents between October 28, 2014 and December 19, 2014. 56.1 Reply ¶ 73.

In a December 22, 2014 email to Swann, Kohler briefly described the October 28, 2014 meeting with Hoey. ECF No. 45-4 at 85. She also described subsequent discussions with Caetano regarding her performance. In particular, she described that on November 14, 2014, Caetano asked her to stop copying counterparts from New York State Homeland Security and Emergency Services Division on correspondence with Congressional offices and to "answer only explicit questions and not provide answers to any inferred questions that the Congressional offices ask." ECF No. 45-4 at 85. She also described a December 9, 2014 discussion with Caetano where he "directed [her] to stop providing answers to inferred questions from all staffers and indicated that New Jersey Office of Emergency Management has stated they refuse to work with [Kohler] due to [her] handling of questions [she] fielded from Senator Menendez's office and Palisades Medical Center at a community meeting Dec. 3." ECF No. 45-4 at 85. Kohler recounted that: "Mr. Caetano said this makes two states who refuse to work with [Kohler], and he doesn't want to have to terminate [her], but he doesn't know what else he can do." ECF No. 45-4 at 85. Kohler also recounted that Caetano read from correspondence "alleging that [she] had upset the Sandy Recovery Office staff many times for failing to answer an inquiry from Senator Schumer's office on behalf of the Town of Hempstead, NY in July" and "for speaking out of turn on two Sandy Recovery projects in New Jersey for Palisades Medical Center and a Secaucus Marina." ECF No. 45-4 at 85. Next, Kohler summarized the December 11, 2014 Performance Expectations Memo she received, which alleged that she "had failed to provide timely reports", "inappropriately responded to program-specific inquiries", "failed to understand when to defer to subject matter experts and in some cases imparted . . . inaccurate information", and "failed to exercise diplomacy in [her] interaction[s] with stakeholders and colleagues." ECF No. 45-4 at 86. She then described

her December 18 and 19 meetings regarding her December 1, 2014 call with Senator Gillibrand's office. ECF No. 45-2 at US0001495.

Kohler closed the email to Swann by listing the following potential remedies: "reassignment to another federal position equal in salary for which [she] [is] qualified"; "removal of Mr. Caetano as [her] supervisor"; and "no reflection of any wrongdoing in performance appraisals, official personnel file or in employment references." ECF No. 45-4 at 86.

> o. *December 24, 2014 – Swann alerts Bresnahan to EEO Activity*

On December 24, 2014, Swann emailed Bresnahan advising him that Kohler requested EEO counseling regarding incidents involving Hoey and Caetano that had occurred from November 13, 2014 through December 18, 2014. 56.1 Reply ¶ 77.

> p. *January 7, 2015 Email to Crystal Tramunti*

On January 7, 2015, Kohler emailed Crystal Tramunti, a co-worker she understood had problems with Hoey in the past. 56.1 Reply ¶ 78. The email said:

> I'm writing to see if you would be willing to write me a written statement regarding incidents you had with Terry Hoey. I am trying to resolve some issue, and I could use the information you shared about the FBI THIRA thing if you're willing. If not, no biggie. Just let me know.

56.1 Reply ¶ 78.

Tramunti replied: "No I'm sorry, him and I worked out our disagreement verbally many months ago." 56.1 Reply ¶ 79. Tramunti also forwarded the email chain to William McDonell, FEMA Region II Deputy Director of Mitigation, and stated: "What's she trying to start (careful with her she's up to no good)." 56.1 Reply ¶ 80. McDonnell, in turn, forwarded Tramunti's email to Caetano, stating: "Heads up. FYI only not sure what's going on. Just for your info." 56.1 Reply ¶ 81. Caetano replied, "She's gaming the game." 56.1 Reply ¶ 81. During his deposition Caetano

testified that he was not aware this email thread related to EEO activity until after Kohler's termination. 56.1 Reply ¶ 82.

q. *January 8, 2015 – Kohler Sends Email Apology to Hoey*

On January 8, 2015, Kohler sent an email to Hoey copying Caetano. It stated:

> The situation with Jim triggered in me a protective instinct, and I now regret getting involved. I apologize for the way my comments made you feel. I want you to know I have very staunch opinions of right and wrong, and I said what I perceived to be happening at the time. I don't expect you and I to be friends, but I expect to be treated with dignity and respect, and I will strive to do the same with you in the future. Please let me know if you don't think the issue is yet resolved.

ECF No. 45-4 at 87.

r. *January 9, 2015 - Email Incident with William McDonnell*

On January 9, 2015, Kohler sent an email to Tonya Evans, Natural Disaster Program Specialist, suggesting that she offer a specific course of action to a PA applicant regarding his property. 56.1 Reply ¶ 84. Kohler wrote: "[m]aybe we should offer him the Letter of Determination option versus LOMA." 56.1 Reply ¶ 84. In response, William McDonnell, FEMA Region II Deputy Director Mitigation, who was copied, replied: "Let's be careful here. We don't make determinations......let's stay in ou[r] lane and refer people to the process." 56.1 Reply ¶ 85. Kohler responded to McDonnell by email, stating, "I'm asking which process he should be referred to—LODR or LOMA?" 56.1 Reply ¶ 86. McDonnell's reply email stated: "[i]f there are two avenues available, we should present and offer both." 56.1 Reply ¶ 87. McDonnell then forwarded the email to Caetano, stating, "FYI." 56.1 Reply ¶ 87.

s. *January 9, 2015 - Email from Caetano to Smith*

On January 12, 2015, Caetano emailed Heather Smith, FEMA Region II Recovery Division Director, which stated that Kohler was "becoming a liability at this point." 56.1 Reply ¶ 88.

> t.      *January 16, 2015 - Email between Ward and Caetano*

On January 16, 2015, Ward sent an email to Caetano regarding Kohler's performance that began, "[h]ere is what I thought regarding our discussion yesterday." 56.1 Reply ¶ 89. Ward explained that Kohler is "clearly mission focused and enjoys a great reputation with the congressional staff, her key constituents and external stakeholders." 56.1 Reply ¶ 89. However he noted that: she "has, on occasion, provided information to staffers that, although factual, was not well coordinated or on target with our overall outreach strategy"; "does not consistently take into consideration the effect of her actions on other external stakeholders"; state program offices in New York were not comfortable with her "providing information within the State without their review and approval"; and had "real challenges working collaboratively with staff. . . Peer to peer interactions were strained, exacerbating her isolation and ability to develop well-coordinated messaging." ECF No. 45-4 at 36; 56.1 Reply ¶ 89.

> u.   *January 16, 2015 - Swann Email to Caetano*

On January 16, 2015, Swann emailed Kohler that she had a right to file a formal complaint. ECF No. 45-4 at 68. That same day, Swann emailed Caetano informing him that he was named "as a party to some of the incidents raised in an EEO complaint." 56.1 Reply ¶ 92. Caetano replied by email, asking for more information. 56.1 Reply ¶ 92. Swann replied:

> [T]he Aggrieved alleges retaliation and harassment by you as her supervisor after meeting with the Security Liaison for bullying and intimidation to an employee with a disability; she was threatened to be terminated due to her handling of questions she fielded from the State Senator at a community meeting; she was issued a written counseling statement.

ECF No. 45-4 at 108.

    *v. January 25, 2015 Kohler declines to proceed with EEO Complaint*

However, on or about January 25, 2015, Kohler met with Caetano, and a co-worker, Danna Lopez. 56.1 Reply ¶ 93. Kohler indicated that she was not going forward with the EEO Complaint. 56.1 Reply ¶ 93.

    *w. January 29, 2015 to February 23, 2015 - Caetano Solicits or is Sent Feedback Regarding Kohler*

On January 29, 2015, Caetano emailed Deanna Platt, Acting PA Branch Chief, for feedback regarding Kohler's performance in late 2014 and early 2015. 56.1 Reply ¶ 40 ,95, 99. Though Platt had previously provided verbal feedback to Caetano regarding Kohler, Caetano asked her to put her feedback in writing. 56.1 Reply ¶ 99-100, 106. On January 30, 2015, Platt sent an email explaining that she believed Kohler's "professional maturity was lacking for someone" of her experience. 56.1 Reply ¶ 96. Platt also stated that she was "taken aback at some of the emails" Kohler had sent her and "felt that [Kohler] showed poor judgment in the way she communicated with a professional colleague." 56.1 Reply ¶ 96.

Caetano also requested a statement from Donna Fisher, Response Division Director, who had also expressed concerns or complaints about Kohler verbally in the past. 56.1 Reply ¶ 107. On February 4, 2015, Fisher sent a memorandum by email that described Kohler as having an "unprofessional attitude" and "unsatisfactory performance." 56.1 Reply ¶¶ 101-102. Fisher also recalled that Kohler "demonstrated a complete lack of flexibility and an unwillingness to participate in [a July 2014] exercise in her pre-designated role." 56.1 Reply ¶ 102. Fisher testified at her deposition that she could not remember whether she wrote the memo in July 2014, when she worked with Kohler, or at the time Caetano requested that she put her views in writing, in February

2015. 56.1 Reply ¶ 105. However, Fisher stated that the content of the memorandum would have been the same either way. 56.1 Reply ¶ 105.

In an email dated February 6, 2015, Belfi also provided feedback about Kohler. Belfi stated that "she 'struggled' to get Kohler to 'work collaboratively' with her", and that "[t]here were a number of instances during [Belfi's] time as PA Branch Chief when [she] and/or [her] team were put in embarrassing and/or uncomfortable positions to [Kohler's] actions." 56.1 Reply ¶ 109. She recounted the June 25, 2014 incident:

> [I]n June of 2014, [Kohler] committed me and my staff to a call with Senator Gillibrand's office, which required us to pull together a large amount of information with only two days' notice. When I responded to her advising her that I had not confirmed her proposed time for the call and that I did not think the staff would be adequately prepared for the call in two days she was indignant and insisted we knew about that call a week before. She offered no apology or even any understanding of the kind of position she put us in.

56.1 Reply ¶ 24. Belfi also criticized Kohler's communication with congressional staffers, stating that she observed Kohler discuss "programmatic issues that she was not equipped to discuss" and noting "tremendous challenges working with [Kohler] on congressional inquiries for PA because [she] found that [Kohler's] communication skills were severely lacking." 56.1 Reply ¶¶ 110-111. Belfi also stated that she found Kohler to be "challenging on a personal level" because Kohler had an "inability to acknowledge her mistakes [and] shortcoming[s]", which made it "very difficult to make continued efforts to collaborate and improve [their] working relationship." 56.1 Reply ¶ 112.

On February 13, 2015, Linda Baldry, Reservist, FEMA Public Assistance, also sent Caetano an email about Kohler's performance at his request. 56.1 Reply ¶¶ 114, 116. Baldry began working with Kohler in the beginning of 2015 to help improve her performance. 56.1 Reply ¶¶ 116-17. Baldry emailed Caetano a list of pros and cons about Kohler, which mentioned that "Kohler 'lacks people skills with her co-workers,' 'is not a team player and is not supportive of

other people in the office,' 'makes other co-workers . . . feel that they [cannot] go to her for help,' 'is abrasive when talking to her peers and condescending,', 'believes she is a subject matter expert when it comes to PA,' 'does not take direction well,' and is not 'FEMA flexible.'" 56.1 Reply ¶ 115.

On February 20, 2015, Carlson emailed Caetano regarding her experience working with Kohler in 2014. 56.1 Reply ¶ 118. Carlson had complained to Caetano verbally in 2014 and offered to provide a written statement. 56.1 Reply ¶¶ 123-24. Carlson stated that Kohler was unwilling to accept her suggestions or guidance and that Kohler, despite having no FEMA program knowledge, "began responding to inquiries 'with misinformation without consulting the subject matter experts despite [Carlson's] strong suggestion to do so.'" 56.1 Reply ¶ 120. Carlson also stated that Kohler continued to resist guidance and sent "very discounting emails" and "would undermine [Carlson] on several occasions." 56.1 Reply ¶ 121. Carlson also reported that Kohler told her "the workload she inherited from [Carlson] was indicative of how ineffective [Carlson's] work was." 56.1 Reply ¶ 121.

On February 23, 2015, Blanciak emailed Caetano regarding "some 'concerning' interactions" that she had with Kohler. 56.1 Reply ¶ 128. Blanciak expressed concern that Kohler had referred to herself as "something of an expert in PA", albeit only to Blanciak. 56.1 Reply ¶ 129. Blanciak also expressed concerns regarding statements made at the October 28, 2014 meeting with Hoey and Kohler. In particular, Blanciak recounted that in response to Hoey's concerns about emails that had been sent out by External Affairs, Kohler replied in substance that "as External Affairs, they could send out anything they like." 56.1 Reply ¶ 130. Blanciak understood Kohler's implication to be that External Affairs "does not need approval from the program or project lead and they can draft and disseminate info[rmation] any way they choose." 56.1 Reply ¶ 130.

    x. *March 4, 2015 - Caetano Contacts Lineburg*

On March 4, 2015, Caetano emailed Lineburg regarding Kohler. He attached the documentation he had compiled regarding her conduct and asked Lineburg's opinion on whether it was sufficient to justify a termination:

> I need to know if I have enough to terminate her if I choose to do so. I'm considering my options right now and need to know if there is sufficient evidence to proceed if I choose to go down that path to terminate her as a CORE (at-will) employee. Please review and let me know your thoughts.

56.1 Reply ¶ 136.

On March 6, 2015, Lineburg replied to Caetano that she was of the view Kohler should be fired:

> After reviewing all of the documentation, it's my opinion that she should be terminated. Her actions have reflected negatively on FEMA, and it's very difficult for the agency to bounce back from these types of incidents. Additionally, it is very disruptive when there is one employee who tries to disassemble the entire group.

56.1 Reply ¶ 138. At Caetano's request, Lineburg began working on Kohler's termination letter. 56.1 Reply ¶ 139.

    y. *April 1, 2015 - Email from Andrew Martin*

On April 1, 2015, Andrew Martin, FEMA Mitigation, circulated an email chain to Caetano, McDonnell and others with notes from an individual named Andrea Sansom about a public meeting. Sansom stated that Kohler "didn't know what she was talking about, contradicted [Martin] and facts in general and it was frustrating." 56.1 Reply ¶ 143. In response, Caetano asked McDonnell whether Kohler was a liability when speaking at meetings, noting that he was "not being cute" and "want[ed] an honest assessment from the SMEs." 56.1 Reply ¶ 143. In response, McDonnell stated: "Yes! Any incorrect contradiction to the SME publicly jeopardizes our credibility and relationships." 56.1 Reply ¶ 143.

26

In a subsequent email, Martin stated that Kohler answered questions that "'should have been answered' by the city, state, or referred to the Governor's office." 56.1 Reply ¶ 144. He also explained that "she provided incorrect information . . . and answered a question that [he] had intentionally avoided answering directly while providing usable, helpful information." 56.1 Reply ¶ 144.

### z.  April 17, 2015 - Kohler's Termination

On April 7, 2015, Kohler was terminated from her position as a CORE Lead Public Affairs Specialist with the Agency. 56.1 Reply ¶ 145. By memorandum, dated April 7, 2015, Caetano informed Kohler that her appointment would be terminated effective that same day. She was charged with unacceptable performance, failure to follow instructions and inappropriate conduct. 56 Reply ¶ 145. The memorandum included four "Specifications" regarding Kohler's unacceptable performance. These are, in part:

> Specification 1: You work as an External Affairs specialist. The duties of [your] position include coordinating responses. You are aware that such a duty is a requirement of your position as evidenced by the Position Description for the Lead Public Affairs Specialist and your Performance Plan for January 1, 2014, through December 31, 2014. Nonetheless, on November 14, 2014, your performance of that duty was unsatisfactory, in that you failed to coordinate your response to a Congressional staff member regarding a meeting with Congressman Reed at Camp Good Days with the joint team (Federal Coordinating Officer, Public Assistance Lead, and Counsel) within the Joint Field Office (JFO) prior to providing partially incorrect information.

ECF No. 45-2 at 274.

> Specification 2: . . . The duties of [your] position include providing timely and accurate information to the public, maximizing responsiveness in delivering accurate, timely and coordinated information to all external stakeholders, and improving the Congressional inquiry process for all involved to include subject matter experts, front office, counsel, constituents and staffers. You are aware that such a duty is a requirement of your position as evidenced by your Employee Performance Plan and Appraisal. Nonetheless, on October 30, 2014, you incorrectly advised a representative from Senator Schumer's office that Camp Good Days, a sub-applicant, would be treated as a critical Private Non-Profit (PNP) Organization.

ECF No. 45-2 at 274.

Specification 3: …The duties of [your] position include providing timely and accurate information to the public, maximizing responsiveness in delivering accurate, timely and coordinated information to all external stakeholders, and improving the Congressional inquiry process for all involved to include subject matter experts, front office, counsel, constituents and staffers. You are aware that such a duty is a requirement of your position as evidenced by your Employee Performance Plan and Appraisal. Nonetheless, on January 9, 2015, you failed to confer with a subject matter expert prior to advising a constituent who was petitioning FEMA to be removed from the flood zone.

ECF No. 45-3 at 1.

Specification 4: …The duties of [your] position include coordinating all activities with senior management and program officials. You are aware that such a duty is a requirement of your position as evidenced by the Lead Public Affairs Specialist Position Description. Nonetheless, on June 25, 2014, you committed the Acting Public Assistance Branch Chief and her staff to a conference call with Senator Gillibrand's office for June 27, 2014, without confirming with the Acting Public Assistance Branch Chief that two (2) days' notice was a realistic timeframe to compile the necessary information and coordinate with all internal parties.

ECF No. 45-3 at 1.

The memorandum additionally included two specifications regarding Kohler's failure to follow

directions:

Specification 1: On August 27, 2014, you were instructed to revise/streamline the PA inquiry system to achieve better organization and prevent duplicative requests. Nonetheless, you failed to follow those instructions.

ECF No. 45-3 at 1.

Specification 2: On July 15, 2014, the Response Division Director instructed you to attend a 15-minute transition brief and provide information regarding the public messaging being issued by State partners. You failed to follow those instructions.

ECF No. 45-3 at 1.

The memorandum also included one specification of inappropriate conduct:

Specification 1: On January 7, 2015, you sent an email to Crystal Tramunti, a fellow employee, requesting that she provide you with a written statement regarding an incident

she had with the Regional Law Enforcement Liaison several months earlier. Your request for information about the Regional Law Enforcement Liaison in an unrelated incident prior to apologizing to the Regional Law Enforcement Liaison for your own conduct resulting in conflict with him was improper and detracted from your character.

ECF No. 45-3 at 1..

The notice also advised Kohler that "[b]ecause [she was] appointed to a position under the [Stafford] Act, Public Law 93-288, as amended, [her] appointment is excluded from the provisions of Title V." 56.1 Reply ¶ 145. The notice also stated that Kohler was not entitled to appeal the termination action to the Merit Systems Protection Board, but could file an appeal with FEMA instead. 56.1 Reply ¶ 145.

### 4.  Review of Termination

#### a.  Internal FEMA Review

Bresnahan was the designated reviewer of Kohler's termination internally. On April 17, 2015, Kohler submitted an Appeal to Notice of Termination of Appointment. ECF No. 45-5 at 10-18. This appeal advanced arguments that are substantially similar to those Kohler advances in this lawsuit.

On April 23, 2015, Bresnahan emailed Lineburg that "there are many inaccurate statements in [Kohler's] response." ECF No. 48-2 at 16. Lineburg replied: "Can you point out those inaccuracies? I will incorporate them into the response." ECF No. 48-2 at 16. Bresnahan replied: "Yes, I will run through it with Don [Caetano] and highlight them. She makes many claims about not being afforded rights as a T5 employee." ECF No. 48-2 at 16. Later that day Bresnahan sent Caetano an email stating: "I am working with Stefanie [Lineburg] on the response to this. Reading it over I believe there are many inaccuracies in the response. Please review, highlight and add comment to the inaccurate comments. Password to follow." ECF No. 48-2 at 6.

Bresnahan did not reverse Kohler's termination.

### b. *EEO Complaint*

On May 22, 2015, Kohler filed a formal complaint of discrimination with the U.S. Equal Employment Opportunities Commission regarding her termination, alleging it was motivated by her sex and retaliation for prior EEO activity. 56.1 Reply ¶ 169. The complaint was later dismissed without prejudice to allow her to pursue a complaint in federal court. 56.1 Reply ¶ 262.

### c. *Whistleblower Complaint*

In September 2015, Kohler filed a complaint under the Whistleblower Protection Act ("WPA") with the Office of Special Counsel ("OSC") of the Department of Justice ("DOJ"). 56.1 Reply ¶ 263. On April 18, 2016, the OSC closed the case finding that Plaintiff's MSPB appeal preceded the OSC filing. 56.1 Reply ¶ 263.

### d. *MSPB Proceedings*

On May 4, 2015, Kohler, *pro se*, filed an appeal with the Merit Systems Protection Board, over which Administrative Judge Maria M. Dominguez presided. 56.1 Reply ¶ 165. On May 20, 2015, FEMA filed a motion to dismiss the appeal, arguing that because Kohler was appointed to a temporary excepted service position as a CORE employee under the Stafford Act, she did not meet the definition of a covered employee under 5 U.S.C. § 7511. *Kohler, Alison v. Dep't of Homeland Sec.*, No. NY-0752-15-0199-I-1, 2015 WL 4712281 (July 31, 2015) ("*Kohler MSPB I*"). Kohler opposed, arguing that she "had earned her 'standing as a covered Federal employee from appointments previous to the February 9, 2014, time-limited appointment with FEMA'" and was within the coverage of 5 U.S.C. § 7511(a)(1)(C)(ii) and 5 C.F.R. § 752.401(c)(5) and (6). *Id.*

AJ Dominguez dismissed Kohler's appeal for lack of jurisdiction because:

(1) FEMA was authorized by the Stafford Act to make appointments 'without regard to the provisions of title 5, United States Code, governing appointments in the competitive service'; (2) she was appointed by FEMA under the Act; (3) the U.S. Court of Appeals has concluded that FEMA was authorized by the Act to 'temporarily employ additional personnel without regard to civil service laws'; and (4) OPM has stated that an appointment authorized by statute to be made 'without regard to the provisions of title 5, United States Code, governing appointments in the competitive service' or 'without regard to the civil service laws' is excluded from coverage of 5 U.S.C. chapter 75.

*Id.*

On August 14, 2015, Kohler filed a petition for review with the full Board challenging the dismissal on jurisdictional grounds. *See Kohler, Alison v. Dep't of Homeland Sec.*, No. NY-0752-15-0199-M-1, 2017 WL 1209632 (Mar. 27, 2017) ("*Kohler MSPB II*"). On February 25, 2016, in light of the fact that two Board members could not agree on the disposition of the petition for review, the initial decision became the final decision of the Board. *Id.* Thereafter, Kohler appealed the Board's final decision to the Federal Circuit. *Id.*

During the proceedings at the Federal Circuit, counsel for the Board moved to have the case remanded back to the Board for its further consideration in light of *Mitchell v. Merit System Protection Bd.*, 741 F.3d 81, 82 (Fed. Cir. 2014). *Id.* The Federal Circuit granted the Board's motion on September 13, 2016, after which the case was remanded to the full Board, which then vacated its prior split-vote order on December 28, 2016 and remanded the case to AJ Dominguez to consider the impact of *Mitchell* on Kohler's case. *Id.*

On remand, AJ Dominguez considered whether *Mitchell* had any impact on her initial decision. In *Mitchell*, the Federal Circuit concluded that a woman who was appointed to an 18-month term as a US Attorney, whose position was notated as "temporary" pending completion of a background check, had not served in a "temporary" appointment within the meaning of Section 7511(a). The *Mitchell* Court reached this conclusion based on "the statute [under which Mitchell

was appointed] and regulations, and the particulars of Ms. Mitchell's tenure as an Assistant United States Attorney." *Id.* at 86. AJ Dominguez concluded that Kohler's situation was distinguishable from *Mitchell* in appointing authority, applicable regulations and factual background, and concluded again that Kohler was not an employee. *Id.* AJ Dominguez again found that Kohler's appointment was temporary, and for that reason, among others, Kohler did not fit the definition of an employee. *Id.*

Subsequently, the Federal Circuit transferred this matter to the Southern District of New York because a substantial portion of the conduct occurred here. ECF No. 1 at 3. FEMA filed the summary judgment motion now before the Court on October 11, 2019. ECF No. 42. Kohler opposed the motion on November 8, 2019. ECF No. 49. FEMA replied on November 11, 2019. ECF No. 53.

STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Where the non-movant bears the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Celotex Corp.*, 477 U.S. at 325. Once the movants meet their initial burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine

issue for trial. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250. The Court is to believe the evidence of the non-movants and draw all justifiable inferences in their favor, *Anderson*, 477 U.S. at 255, but the non-movants must still do more than merely assert conclusions that are unsupported by arguments or facts. *Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996). "Summary judgment is appropriate even in discrimination cases, for, as [the Second Circuit has] noted, 'the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 40-41 (2d Cir. 2000) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

## DISCUSSION

The Court now considers whether FEMA is entitled to summary judgment on Kohler's claims that (1) she was retaliated against for protected activity; (2) there was a hostile work environment at FEMA based on gender; (3) she was discriminated against based on gender; (4) her termination violated the Whistleblower Protection Act; (5) the MSPB has jurisdiction over the appeal of her termination; and (6) she was deprived due process with respect to her termination. For the reasons that follow, the Court concludes summary judgment in favor of FEMA is warranted on all of Kohler's claims.

### 1.  Retaliation

The Court begins its analysis with Kohler's claim that she was subject to retaliation for opposing discrimination against her colleague, Flemming, who is visually impaired. For the reasons that follow, the Court concludes FEMA is entitled to summary judgment on this claim.

"Title VII of the Civil Rights Act of 1964 provides that it shall be an unlawful employment practice for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 89-90 (2d Cir. 2015) (citing 42 U.S.C.S. § 2000e-3(a)). Even if an employee is not the victim of prohibited discrimination, Title VII protects her against retaliation for protesting against such discrimination. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 285 (2d Cir. 1998) (citing *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)).

Federal retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-804. *See, e.g., Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). Under the first step of the *McDonnell* framework, "the plaintiff must establish a prima facie case of retaliation by showing (1) 'participation in a protected activity'; (2) the defendant's knowledge of the protected activity; (3) 'an adverse employment action'; and (4) 'a causal connection between the protected activity and the adverse employment action.'" *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 843-44 (2d Cir. 2013) (citing *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). The Supreme Court has held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). However, "a plaintiff may still demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity." *Kwan*, 737 F.3d at 845.

34

If a plaintiff establishes a prima facie case of retaliation such that a presumption of retaliation arises, the burden next shifts to the defendant to demonstrate some legitimate, non-retaliatory reason for the adverse decision or action. *McDonnell*, 411 U.S. at 802; *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011). If the defendant carries that burden, the defendant is then entitled to summary judgment unless the plaintiff comes forward with evidence showing that the "non-retaliatory reason is a mere pretext for retaliation," *Kwan*, 737 F.3d at 845, and that the plaintiff's "protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362.

To prove that retaliation was a but-for cause of an adverse employment action, a plaintiff may demonstrate "weaknesses, implausibilities, or contradictions in the employer's proffered legitimate, non-retaliatory reasons for its action." *Kwan*, 737 F.3d at 846 (citing, *inter alia*, *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105-107 (2d Cir. 2001)). A reasonable juror could conclude from such discrepancies "that the explanations were a pretext for a prohibited reason." *Id.* To show pretext and retaliatory motive, a plaintiff "may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Id.* (citing *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)).

### a.   *Prima Facie Case of Retaliation*

#### i.   Protected Activity

As an initial matter, the Court must consider what of Kohler's conduct constitutes protected activity. The Second Circuit has held that "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's [complaint] was directed at *conduct prohibited by Title VII*." *Rojas*

*v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107-108 (2d Cir. 2011) (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)). Accordingly, a plaintiff fails to state a prima facie case for retaliation when they make "generalized" complaints that their employer "could not reasonably have understood [to be] complaining of 'conduct prohibited by Title VII.'" *Id.*

Here, Kohler alleges two instances of protected activity: the October 28, 2014 meeting with Hoey and her EEO activity pertaining to Caetano and Hoey. The latter is plainly protected activity. However, no reasonable jury could find that Kohler's general complaint at the October 28, 2014 meeting was protected activity.

During the meeting, Kohler complained repeatedly that Hoey was a bully. Though Kohler alleges that the meeting arose to defend Flemming against bullying based on his disability by Hoey, it is undisputed that Kohler never mentioned Flemming's disability during the meeting. To be sure, courts have found that "where an incident evinces on its face some discriminatory conduct, a party's complaint about that incident is protected by Title VII." *Wallen v. Teknavo Grp.*, No. 12-CV-6196-MKB-SJB, 2018 U.S. LEXIS, at *63 (E.D.N.Y. Feb. 22, 2018) (citing *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 652 (S.D.N.Y. 2015)). Here, Hoey's demand that Flemming recall an email does not evince discrimination on its face, as it is undisputed that Hoey never mentioned Flemming's disability during that particular conversation.

Even if Kohler was aware of prior incidents where Hoey did target Flemming based on his disability, FEMA would not have been alerted to the connection by Kohler's allegations of "bullying" by Hoey at the October 28, 2014 meeting or the details of the precipitating incident. In fact, the record contains no evidence that Kohler alerted Caetano, or anyone else at FEMA, that the October 28, 2014 meeting was to complain of discrimination against Flemming based on his

disability in the immediate aftermath of the meeting or at any time prior to Swann disclosing Kohler's EEO activity.

Plaintiff's attempt to rely on a lone mention by Flemming of his disability in an email on which Caetano was copied is unavailing. Flemming replied to an email in which Kohler recounted the October 28, 2014 meeting—with no mention of his disability, and copied Caetano. Flemming responded to the substance of Kohler's email about the meeting, disputing that Hoey had given him certain guidance on what to include in Blue Campaign communications. Flemming added: "[Hoey] has publicly humiliated and degraded me as well in the past by calling attention to my disability as if his comments were some joke." EFC No. 48-2 at 3. While this is deplorable if true, Flemming's allegation does not relate to the October 28, 2014 meeting, nor can it be reasonably read to inform Caetano that this past discrimination was the purpose of Kohler's meeting. This is particularly so because Kohler admits that the only ways in which she attempted to tell Caetano that Flemming was being discriminated against for his disability were by stating that Hoey was a "bully" and that Flemming was an "object of intimidation" by Hoey. 56.1 Reply ¶ 37. These statements, like those at the meeting itself, are too general to have alerted FEMA that the October 28, 2014 meeting was to object to discrimination based on disability.

Accordingly, the Court concludes that Kohler fails to state a prima facie case for retaliation based on the October 28, 2014 meeting. However, the Court will consider whether Kohler has satisfied the remaining prongs as to her contact with FEMA EEO Counselor Mary Swann, which is protected activity. There is no dispute that Caetano was alerted to Kohler's EEO activity on

January 16, 2015 by email from Swann[4]. Nor is there any dispute that Kohler's termination would constitute an adverse employment action. The remaining question is whether Kohler has shown an inference of retaliation is warranted.

ii.   Causal Connection

Kohler relies on the temporal proximity between the revelation of her EEO complaint and her firing to show a causal connection between the two. "[T]emporal proximity can demonstrate a causal nexus" between protected activity and an adverse employment action. *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). However, "where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Id.* Here, Caetano was notified about the EEO complaint on January 16, 2015 by email from Swann, and Kohler was fired on April 7, 2015. To be sure, under other circumstances, the lapse of three months permits an inference of causal connection. *See Garcia v. Yonkers Bd. of Educ.*, 15 Civ. 0767, 2018 WL 4007648, at *7 (S.D.N.Y. Aug. 21, 2018). But Kohler completely ignores the undisputed record of gradual adverse job actions that began well before she engaged in any EEO activity.

The record contains contemporaneous emails indicating problems with Kohler's performance from as early as June 2014, well before Swann disclosed Kohler's EEO activity. Specifically, around June 25, 2014, Catherine Belfi complained about Kohler scheduling a meeting

---

[4] Though Bresnahan was informed of the EEO complaint on December 24, 2014, nothing in the record indicates Caetano was aware of the EEO complaint prior to Swann's January 16, 2015 email. Plaintiff implies that Caetano may have known sooner, Opp. at 19, but presents no evidence that creates a genuine dispute of fact. For example, Kohler asserts that her email to Tramunti on January 9, 2015 seeking information regarding a prior conflict with Hoey supports an inference that Caetano knew about her EEO activity at that time. Opp. at 5 n.6. But the email contains no information that indicates or implies that Kohler was seeking the information for her own EEO activity nor does it mention Caetano at all. Accordingly, it could not be reasonably read to alert Caetano to her EEO activity. However, even if Caetano did know of the EEO activity on January 9, 2015 or December 24, 2014, that would not alter the Court's conclusions at the various stages of the *McDonnell* analysis.

with the office of Senator Gillibrand without confirming the time with her. In late October, Belfi complained that Kohler gave wrong information to Senator Schumer's office. In November 2014, Belfi was concerned when Kohler sent a draft document to FEMA headquarters that Belfi had not signed off on. Also in November 2014, Lineburg met with Caetano about Kohler's friction with co-workers and suggested a performance expectations memo. That same month, there were complaints related to how Kohler interacted with Congressman Reed's office. Kohler admits that she had several discussions with Caetano where he provided negative feedback regarding her performance. During early December 2014, Caetano told Kohler that she was "persona non grata" in both New York and New Jersey. On December 11, 2014, Caetano issued a Performance Expectations memorandum citing various problems with Kohler's performance, including that she: (1) failed to submit reports in a timely fashion; (2) overstepped her role by inappropriately responding to program-specific constituents without confirming the substance of her response with the relevant program office; (3) failed to exercise proper judgment as to when to defer to subject matter experts in responding to inquiries, sometimes resulting in incorrect or inaccurate information being relayed to applicants and grantees; and (4) had difficulty in exercising diplomacy in her demeanor when interacting with stakeholders and colleagues.

These performance concerns continued into 2015. In early January 2015, Caetano was forwarded an email where McDonnell admonished Kohler not to make recommendations to FEMA applicants, but to refer them to the process. On January 12, 2015, Caetano himself sent an email saying that Kohler was "becoming a liability." A January 16, 2015 email indicated that Caetano had spoken with Ward on January 15, 2015 about his concerns regarding Kohler's performance. Prompted by this conversation, Ward, sent Caetano a negative assessment of

Kohler's performance on January 16, 2015. Only on January 16, 2015 did Caetano learn that he was the subject of EEO activity by Kohler.

In the face of the myriad gradual adverse job actions that far precede the revelation of Kohler's EEO activity, no inference of retaliation arises in relation to her termination. Because Kohler has failed to carry her burden to show a prima facie case of retaliation, FEMA is entitled to summary judgment on this claim.

### b.   Non-Pretextual Non-Retaliatory Reason for the Adverse Decision

Had Kohler carried her burden to establish a prima facie case of retaliation, FEMA would still be entitled to summary judgment because it carried its burden to show a non-pretextual, legitimate, non-retaliatory reason for Kohler's termination. *McDonnell*, 411 U.S. at 802; *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011). FEMA argues that Kohler was terminated because "Caetano had received extensive derogatory information about Kohler, he repeatedly tried to counsel her, and she failed to comply with his directions." Mot. at 30. As outlined above, the record amply supports FEMA's explanation for Kohler's termination.

### c.   Pretext

The burden shifts back to Kohler to show this reason was pretextual. "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). To prove that retaliation was a but-for cause of an adverse employment action, a plaintiff may demonstrate "weaknesses, implausibilities, or contradictions in the employer's proffered legitimate, non-retaliatory reasons for its action," *Id*. (citing, *inter alia*, *Byrnie*, 243 at 105-07), from which a reasonable juror could conclude "that the explanations were a pretext for a prohibited reason." *Id*. "[T]emporal proximity

is insufficient to satisfy appellant's burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).

Kohler makes many arguments to try to show pretext, but each one fails under scrutiny. *First*, Kohler argues that the inclusion of her January 8, 2015 email to Tramunti seeking a statement about Hoey among the reasons for her termination is direct evidence of retaliation. This argument fails because it is based on a mischaracterization of the record and a mistake of law. As a factual matter, the mention of the Tramunti email does not demonstrate pretext. Rather, it is consistent with the general concerns that Kohler overstepped the bounds of her role and was not collegial. For instance, the termination memorandum explains: "Your request of Ms. Tramunti was inappropriate and does not promote comradery within the work group." ECF. No. 45-3 at 4. An email from Lineburg, the drafter of the memo, indicates that she understood Kohler reaching out to Tramunti to be another example of Kohler stepping beyond her role:

> Another question (I'm sorry!) – when the grievance filed by Hoey was closed out, was he subjected to working with Kohler after that? Were there any other issues? I am trying to articulate the fact that after the grievance was closed out, she continued to pursue derogatory info on Hoey (by emailing Tramunti requesting a written statement). Even if she had filed an EEO complaint, etc., against Hoey, it would have been up to investigators to obtain statements. Again, out of her lane and totally inappropriate.

ECF. No. 45-4 at 88. This is consistent with the explanation that was given for her firing and does not suggest pretext.

Kohler also makes a mistake of law when she says that the very mention of the Tramunti email satisfies her burden to show that her protected activities "were a motive" in her termination and prevent summary judgment. She errs by invoking the causation standard from *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), which applies to discrimination cases, but not retaliation cases. *Natofsky v. City of N.Y.*, 921 F.3d 337, 348 (2d Cir. 2019) (" [E]ven though Title

41

VII permits mixed-motive causation for claims based on the personal characteristics of race, color, religion, sex, or national origin (*i.e.*, 'status-based' discrimination), it does not permit mixed-motive causation for retaliation-based claims. *Nassar*, 570 U.S. at 360."). Kohler must show that her protected activity was a "but for" cause of her termination. On this record, Kohler cannot make that showing.

*Second*, Kohler asserts that the specifications in her termination notice are inaccurate, and therefore show pretext. But the examples Kohler cites do not point to any bona fide fabrication—just her own disagreement with the significance of the transgressions or where blame should lie. This comes across most clearly in Kohler's objections to the incidents involving Belfi. For instance, Kohler argues that Belfi herself was to blame for not following up regarding the meeting with Senator Gillibrand or regarding Kohler revising the process of tracking applications. Kohler also contends that termination for scheduling a meeting with the office of Senator Gillibrand without consulting Belfi is disproportionate and could allow a jury to infer retaliatory motive. Kohler's reliance on these examples to show pretense is misplaced. This is because Belfi complained about many of the specific incidents involving Kohler at the time they occurred, long before Kohler engaged in any protected activity. Whether Kohler agrees with the import of the incidents or not, the record is clear that Belfi had formed a negative assessment of Kohler long before her EEO activity and is not engaged in ex-post nitpicking of Kohler's performance. Furthermore, the suggestion that a mere scheduling problem led to Kohler's termination is disingenuous. This was just one of many instances of Kohler not meeting performance expectations reported by Belfi and others, inside of FEMA and outside, which led to her termination. There is no suggestion of pretext here.

Kohler's allegation that Specification 3 of Unacceptable Performance was untruthful merits consideration as well. She argues that Specification 3 falsely "accuse[s] her of removing a constituent from a flood zone, when she had actually removed him from an email 'thread of communication.'"Opp. at 24. The problem with this argument is that it requires a strained reading of Specification 3 that no reasonable jury would arrive at.

Specification 3 states, in part: "Nonetheless, on January 9, 2015, you failed to confer with a subject matter expert prior to advising a constituent who was petitioning FEMA to be removed from the flood zone." The memo later clarifies:

> On January 9, 2015, you *attempted* to advise a constituent who was petitioning FEMA to be removed from the flood zone. In discussing this with Natural Hazards Program Specialist, Tonya Evans, you stated, 'I removed Mr. Moore. It looks to me like his property is in Zone X' (see attached). Maybe we should offer him the Letter of Determination option versus LOMA. $80 versus EC fee.' You did not have the authority to make that determination. In response to your actions, William McDonnell, the Deputy Director of Mitigation for the region, advised you, "let's be careful here. We don't make determinations....let's stay in our lane and refer people to the process.

ECF No. 45-2 at 56-57 (emphasis added).

Further context is provided by the full email thread. Kohler replied: "Roger…I'm asking which process he should be referred to—LODR or LOMA", to which McDonnell answered: "If there are two avenues available we should present and offer both." ECF No. 45-1 at 00069. McDonnell forwarded this thread as an "FYI" to Caetano on January 9, 2015. With the additional context, no reasonable jury could conclude this is an unfounded accusation of Kohler literally removing someone from a FEMA flood zone. McDonnell's response is consistent with other criticism of Kohler for engaging in inquiries beyond the scope of her role. This is in line with the rationale for Kohler's termination and does not suggest pretext.

43

*Fourth*, Kohler contends that the timing of the written submissions shows pretext. Kohler makes the overarching allegation that "Caetano clearly sought stale or suspiciously resurrected criticism of Plaintiff that had not been given to her before and offered it to her almost a year after the event related to it." Opp. at 27. This argument is incompatible with the record. It is undisputed that Caetano received criticism of Kohler throughout her tenure, and that he had conversations with Kohler about how to change her performance. Further, the record is clear that Kohler did know who many of the complainants were. In fact, the record shows that Belfi, McDonnell, and others gave Kohler feedback directly.

To be sure, some of the reports on which Kohler's termination relied, such as those by Carlson, Belfi, and Fisher, include incidents that occurred in 2014. However, the record does not support Kohler's assertion that the performance concerns were stale. Other reports relied on for Kohler's termination, such as those from McDonell, Baldry, Ward and Platt, were from 2015. In fact, complaints continued even after the decision to terminate Kohler was made. On April 1, 2015, Caetano received a complaint about Kohler inappropriately answering questions at a meeting and contradicting a colleague. A reasonable jury could not conclude that where, as here, a continuous record of underperformance exists, the reliance on older instances among more recent instances demonstrates pretext.

*Fifth*, Kohler argues that the manner in which certain reviews were received showed pretext. In particular, she points to Carlson's use of her private email to correspond with Caetano about Kohler and an offer from Fisher to backdate her memo about Kohler. Kohler regards these as "cover ups" that "certainly allow a jury to infer that Defendants were discreetly attempting to manipulate the facts to obscure the truth as to the timing of Fisher's complaints about Plaintiff." Opp. at 25. The Court sees no significance in what email address Carlson used, and no reasonable

44

jury could. Nor does Fisher's offer to post-date indicate pretext. There is no proof that the content of her report on Kohler would have differed in any way.

*Sixth*, Kohler contends that Bresnahan and Lineburg, who were aware of Kohler's prior EEO action against Caetano, failed to factcheck her notice of termination both before her termination or on appeal. Kohler also sees pretext in Bresnahan giving her appeal to Caetano to solicit his comments. Opp. at 24. Kohler contends this is a departure from procedure and process that is evidence of pretext. In certain contexts, procedural deviations may lead a finder of fact to infer that an employer was "dissembling to cover up a discriminatory purpose." *Richards v. Calver*, No. 99 Civ. 12172, 2005 U.S. Dist. LEXIS 5365, at *25 (S.D.N.Y. Mar. 31, 2005). But Kohler presents no evidence that it was the role of Lineburg or Bresnahan to factcheck her Notice of Termination prior to her firing. Nor has she shown that there were any substantive errors to be found prior to her termination or on appeal. Further, it does not appear unreasonable that Bresnahan would consult Caetano about the circumstances of Kohler's termination as part of the appeal process. Indeed, Kohler has not pointed to any adverse impact from Caetano's review of the appeal. This does not show pretext.

Finally, Kohler urges the Court to conclude she has shown pretext based on her receipt of an "achieved expectations" performance review for 2014 and an in-grade increase in pay authorized in December 2014 that went into effect on February 8, 2015. Opp. at 27-28. No reasonable jury could infer that these ratings create a question of fact regarding Kohler's performance. The performance review of "achieved expectations" is not a stellar one. The scale, from worst to best is: "Unacceptable" - less than 2.5; "Achieved Expectations" - 2.5-3.4; "Exceeded Expectations" - 3.5-4.4; and "Achieved Excellence" - 4.5 or more. ECF No. 45-3 at 111. That Kohler's performance was not marked the lowest rating ("Unacceptable") rather than

one step above ("Achieved Expectations") does not create a triable issue in the face of the well-documented evidence of her performance issues.

Furthermore, the assumption undergirding Kohler's argument is that if she were indeed performing poorly in 2015, Caetano would have downgraded her performance for 2014. Because he did not do so, she must not have been doing so badly. This has it backwards. The Court might look with suspicion on Caetano deflating Kohler's 2014 ratings based on her 2015 performance or revoking a raise because though she had acceptable performance at the relevant time her performance had gotten worse. However, the Court sees no reason to infer pretext from Caetano not downgrading Kohler's past performance ratings to be less favorable.

In sum, even if Kohler had carried her initial burden, FEMA would be entitled to summary judgment on the basis of its legitimate, non-discriminatory reason to fire Kohler, which Kohler has failed to show to be pretextual.

2.  Hostile Work Environment Claim

Now, the Court turns to Kohler's claim that she was subjected to a hostile work environment based on gender. As noted above, the occurrence of the incidents relevant to this claim are in dispute. However, even taking the record in the manner most favorable to Kohler, the Court concludes that FEMA is entitled to summary judgment on this claim.

A plaintiff claiming that her employer created or tolerated a hostile work environment based on sex must demonstrate that (1) she subjectively perceived her work environment as hostile or abusive, (2) a reasonable person would find the work environment objectively hostile or abusive, and (3) the hostility or abuse was based on sex. See *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). To satisfy this standard, a plaintiff must

"produce enough evidence to show that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." G*orzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (internal quotation marks omitted). The Second Circuit has explained:

> The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. There is no mathematically precise test, however, for deciding whether an incident or series of incidents is sufficiently severe or pervasive to alter the conditions of a plaintiff's working environment. Instead, courts must assess the totality of the circumstances, considering elements such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect of identified incidents on the employee's psychological well-being is also relevant, though not determinative.

*Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citations and internal quotations omitted).

Here, Kohler fails to make all three required showings. *First*, Kohler makes no showing that the comments and incidents of which she complains were based on gender. Kohler contends that several things comprise the hostile work environment, including: vulgar comments from Caetano about other FEMA employees and reporters; Caetano referring to a female employee as fit while implying that another is not; Caetano urinating near the driver's side of a car while Kohler was in the passenger seat; Caetano allegedly threatening to fire her for confronting Hoey about his bullying; and statements by Caetano (encouraging Kohler to take a "softer" approach, "get in good with" and "ingratiate" herself to co-workers), Bresnahan (stating that women get labeled for being assertive and men don't), and Baldry (suggesting Kohler plant ideas with someone with "credibility") that Kohler contends invoke gender stereotypes.

Kohler has failed to show these comments or incidents were caused by gender. Kohler has not alleged any facts that show the comments Caetano allegedly made regarding co-workers or reporters were made because of Kohler's gender. Caetano's statements about the fitness of a FEMA employee, without more, are not gender-based. *See King v. Aramark Servs.*, No. 1:19-CV-77, 2019 U.S. Dist. LEXIS 129284, at *49 (W.D.N.Y. July 29, 2019) (collecting cases distinguishing gender-neutral, albeit rude, comments regarding weight from comments that evince gender discrimination). As to the urination incident, Kohler herself attributes that to crassness, rather than anything to do with her gender. Further, the allegation in Kohler's Opposition that Caetano threatened to fire her for confronting Hoey is unsupported by the record. Kohler testified that Caetano said he "didn't want to fire her" and her account of the meeting to Bresnahan indicates the statement was made in connection with her being persona non grata in New York and New Jersey. It also has no apparent connection to her gender, and Kohler has come forth with no facts showing a connection.

This leaves the statements from Caetano, Bresnahan, and Baldry, which require a closer look. "'[S]tereotyped remarks can certainly be evidence that gender played a part' in an adverse employment decision." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004). This applies to the "supposition that a woman *will* conform to a gender stereotype (and therefore will not, for example, be dedicated to her job), as to the supposition that a woman is unqualified for a position because she does *not* conform to a gender stereotype." *Id.* However, the Second Circuit has made clear that it is not "objectively reasonable to label [] innocuous words as semaphores for discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 44-45 (2d Cir. 2000). This is especially true where the plaintiff holds a job requiring "satisfactory qualities of personality and character." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 74 (2d Cir. 2015); *see also DeVito*

48

*v. Valley Stream Cent. High Sch. Dist.*, No. 09-CV-0287, 2011 U.S. Dist. LEXIS 87441, at *9 (E.D.N.Y. Aug. 3, 2011).

Here, Baldry's statement that Kohler should funnel her ideas through someone with "credibility" is not reasonably viewed as referring to gender. Men and women can be credible. This cannot reasonably be a "semaphore for discrimination." Nor can Caetano's suggestions that Kohler "soften" her approach, "get in good with" colleagues, and "ingratiate" herself to them be reasonably viewed as relating to her gender. Currying the favor of colleagues by making a "soft" sell or "getting in good" with them or "ingratiating" oneself may be done by a man or a woman. Further, the record makes clear that Kohler's ability to win over and influence her colleagues was in fact a matter central to her job performance. After all, Kohler served as a liaison between many stakeholders in a complex bureaucracy. Given this context, it would be unreasonable to read Caetano's comment as related to gender, as Kohler did. Finally, Bresnahan's statement that women may be labeled for being assertive cannot reasonably be considered an expression of hostility towards Kohler based on her gender. His statement can only reasonably be read as enunciating a perceived societal double standard to express sympathy with Kohler, not endorsing it. Kohler therefore fails to make the required showing of causation.

Kohler has also failed to make the required showing that FEMA was a subjectively hostile work environment. Even assuming that all of the incidents complained of occurred as Kohler said they did, she has not testified that they interfered with her work performance at all, much less unreasonably. When asked what impact Caetano's alleged vulgar statements made, Kohler testified that they "solidified her poor opinion of Caetano." Kohler also testified that Caetano allegedly urinating outdoors near a car she was seated in did not impact her work performance going forward. Kohler did not testify to any negative impacts on her work based on comments

from Baldry that she should plant her ideas with someone with "credibility"; from Caetano that she should take a "softer" approach to working with her colleagues; or from Bresnahan that women get unfairly labeled for being assertive.

Nor would it be objectively reasonable for someone to consider these incidents to amount to a hostile work environment based on gender. These are, at most, episodic offensive utterances that are not continuous or concerted and do not threaten to alter Kohler's conditions of employment. Kohler's contentions are insufficient to create a triable issue regarding whether her workplace was permeated with discriminatory intimidation, ridicule, and insult. FEMA is therefore entitled to summary judgment on Kohler's hostile work environment claim.

### 3.   Discrimination Based on Sex

The Court now turns to Kohler's claim of discrimination based on gender. For some of the same reasons that summary judgment is due on the retaliation and hostile work environment claims, it is also due on this claim.

To establish a prima facie case of gender discrimination under Title VII, a plaintiff must demonstrate the following: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (citing *Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)). Once a plaintiff has established a prima facie case of age or gender discrimination, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the [adverse act].'" *Patterson v. Cty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)). If the defendant carries that burden,

"the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

For the same reasons that Kohler failed to show gender caused the alleged hostile work environment, she also fails to show circumstances giving rise to an inference of discrimination. She therefore does not carry her burden to show a prima facie case of gender discrimination, and summary judgment in FEMA's favor is warranted. Moreover, even if Kohler had carried her initial burden, summary judgment would be warranted because FEMA has shown a legitimate, non-discriminatory reason for Kohler's termination that Kohler has not shown to be pretextual, as explained for Kohler's retaliation claim.

4. Whistleblower Claim

Next, the Court turns to Kohler's Whistleblower Protection Act claim. As described below, the Court concludes that Kohler's WPA claim fails because she did not engage in a protected disclosure.

The WPA "provides most federal agency employees with protection against agency reprisals for whistleblowing activity", including "gross mismanagement", relevant here. *Stella v. Mineta*, 284 F.3d 135, 142 (2002) (citing 5 U.S.C. § 2302(b)(8)). A protected disclosure is defined, in relevant part, as: "(A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences -- (ii) gross mismanagement." 5 U.S.C. § 2302(b)(8). "To assess whether an employee's belief is reasonable that his disclosures evidence a scenario covered under § 2302(b)(8)(A), a reviewing court must ask what 'a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee' would

reasonably believe. A purely subjective perspective of an employee is not sufficient." *Groseclose v. Dep't of the Navy*, 459 F. App'x 918, 922 (Fed. Cir. 2012) (citing *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)). With respect to gross mismanagement, the employee must disclose "such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people," and the matter that is the subject of the disclosure must be "significant." *White v. Dep't of the Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004).

Here, Kohler contends that she made a protected disclosure by reporting to Senator Gillibrand's office that FEMA had a backlog of more than 200 appeals during a December 1, 2014 phone call. [5] Opp. at 41. Kohler sent Caetano an email memorializing the December 1, 2014 call that same day. ECF No. 45-4 at 49.6. No disinterested observer could conclude that Kohler was making a § 2302(b)(8) "gross mismanagement" disclosure by stating that there were over 200 appeals during that call.

Kohler's own memorandum about the call indicates that she did not assert a specific cause for the backlog, much less a cause that rises to the level of gross mismanagement. Kohler described two answers she gave on the question of why there was a backlog of appeals from Hurricanes Irene and Sandy: "I didn't know except that we did inherit more residual work at the Region than we're typically resourced to handle" and "Unsure, some people who were around during the disaster have indicated nothing out of the norm, but others indicated the staff just didn't complete the work they should have in the year the JFO was open." ECF No. 45-4 at 49.6. Kohler could not have

---

[5] FEMA's brief also addresses an alleged protected disclosure made to Congressman Tom Reed. Mot. at 44. However, Kohler's opposition only argues that the disclosure to Senator Gillibrand's office was a WPA protected disclosure. Opp. at 40-42. Accordingly, the Court deems Kohler to have abandoned her argument as to the statements to the office of Congressman Reed. *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

reasonably believed that these statements, which admit that Kohler does not know the cause of the backlog, were evidence of gross mismanagement.

That Kohler could not have believed she was making a protected disclosure is also evident from the remainder of the email, which indicates that Kohler reported that FEMA was taking steps to address the backlog. These steps include making gradual progress on pending appeals and allocating and hiring more staff. Kohler was saying that the solution was underway, not seeking an intervention.

Kohler's disclosure is clearly distinguishable from the kind of specific information that was disclosed by the whistleblower in *Shriver v. Dep't of Veterans Affairs*, No. DC-1221-01-0043-W-1, 2001 WL 946819 (M.S.P.B. Aug. 9, 2001), on which Kohler seeks to rely. There, the complaining employee "specified in detail the nature of his disclosure, involving the agency's failure to process a large quantity of mail numbering in the thousands, dating back several years, which required the agency to reopen many previously adjudicated cases for readjudication." *Id.* Kohler, on the other hand, conveyed the fact of a backlog, did not identify what actually caused the backlog, and highlighted steps FEMA was already taking to address the backlog. This is not a disclosure of "gross mismanagement."

Nor has Kohler offered any legal authority, or any basis at all, on which the Court might conclude the backlog was too big or the resolution of the appeals was impermissibly untimely. That a Senator's office seeks a faster resolution of applications does not support a reasonable belief that FEMA has engaged in gross mismanagement. As Kohler herself agrees, gross mismanagement is more than *de minimis* wrongdoing or negligence. Opp. at 41 (citing *Embree v. Dep't of Treasury,* 70 M.S.P.R. 79, 85 (1996)). No reasonable jury could find that Kohler disclosed gross

mismanagement as required by 5 U.S.C. § 2302(b)(8). Accordingly, FEMA is entitled to summary judgment on this claim.

### 5.  MSPB Jurisdiction

The Court now reviews the determination that the MSPB lacked jurisdiction over Kohler's appeal. For the reasons below, the Court concludes that the MSPB did not have jurisdiction over Kohler's appeal.

Whether the Board has jurisdiction to adjudicate a case is a question of law, which we review *de novo. Forest v. Merit Sys. Protection Bd.*, 47 F.3d 409, 410 (Fed. Cir. 1995) (citing *Vesser v. Office of Pers. Mgmt.,* 29 F.3d 600, 603 (Fed. Cir. 1994)). The Board's jurisdiction is limited to those matters over which it has been given jurisdiction by law, rule, or regulation. *Maddox v. Merit Sys. Protection Bd.*, 759 F.2d 9, 10 (Fed. Cir. 1985). The appellant has the burden of proving by preponderant evidence that her appeal is within the Board's jurisdiction. *See* 5 C.F.R. § 1201.56(a)(2).

MSPB's appellate jurisdiction is defined in 5 U.S.C. § 7701, which provides that "[a]n employee, or applicant for employment, may submit an appeal to the . . . [MSPB] from any action which is appealable to the Board under any law, rule, or regulation." 5 U.S.C. § 770l(a). An "employee" includes "an individual in the excepted service (other than a preference eligible. . . who has completed *2 years of current continuous service in the same or similar positions in an Executive agency under other than a temporary appointment limited to 2 years or less.*" 5 U.S.C. §7511(a)(l)(C)(ii) (emphases added). When jurisdiction of the MSPB is factually disputed and jurisdiction cannot be determined by documentary evidence, the MSPB should hold an evidentiary hearing to resolve the jurisdictional question if the appellant has made nonfrivolous allegations

that jurisdiction is proper. *Coradeschi v. Dept. of Homeland Sec.*, 439 F.3d 1329, 1332 (Fed. Cir. 2006).

Kohler argues that Stafford Act Employees are not excluded from Title V, and that under Title V she is an employee entitled to appeal before the MSPB. Kohler cannot carry her burden to show that the MSPB has jurisdiction over her appeal with this argument. Even assuming that Kohler were covered by Title V—which this Court need not decide—she still would not be an employee within the meaning of Section 7511(a)(l)(C)(ii). Under this provision, "the phrase 'current continuous' indicates that in order to determine the continuity requirement, [a court] must look at the individual's employment at the time of removal and determine whether there has been a break in service during the two years that immediately precede the removal date." *Roy v. Merit Sys. Prot. Bd.*, 672 F.3d 1378, 1381 (Fed. Cir. 2012). "The phrase 'other than a temporary appointment' indicates that temporary appointments (limited to two years or less) do not count toward the two-year current continuous service requirement." *Id.* Kohler has not shown that she worked other than under a temporary appointment at the time of her termination, and therefore fails to qualify as an employee under Section §7511(a)(l)(C)(ii).

Kohler has come forth with no facts indicating her position at FEMA was "other than a temporary appointment limited to 2 years of less." Instead, the record is clear that at all times Kohler was a temporary employee. She was appointed pursuant to the Stafford Act which authorizes FEMA "to appoint and fix the compensation of such temporary personnel as may be necessary, without regard to the provisions of Title 5 governing appointments in competitive service." 42 U.S.C. § 5149(b)(1) (emphases added). The Vacancy Announcement "FEMA-13-LN-15731CORE" referred to the position as "a 2-year temporary appointment in the Excepted Service." Kohler's Offer Letter called her position a "Temporary Appointment." "The appointment

was not to exceed 2 years, and would therefore expire on February 8, 2016." Kohler does not present any facts to show that her appointment was other than temporary.

Kohler's argument that her position at FEMA was not temporary as a matter of law relies almost exclusively on *Mitchell*, which is distinguishable. As an initial matter, Mitchell was appointed as a United States Attorney under the authority of 28 U.S.C. § 542, the general provision for appointing AUSA's. *Mitchell*, F.3d at 86. In this case, the Stafford Act, the statute authorizing Kohler's hire, focuses on appointing and paying temporary employees. Further, the real issue in *Mitchell* was whether the roughly seven months the plaintiff spent working while waiting for a background check—which could have taken up to eighteen months—was a "temporary appointment limited to 2 years or less" that would not be included in her continuous period of service under 5 U.S.C. § 7511(a)(1)(C)(ii). If the seven months were something other than a temporary appointment, the time would count toward Mitchell's continuous period of service, which would then exceed two years and qualify her as an employee under 5 U.S.C. § 7511(a)(1)(C)(ii). The court concluded that Mitchell's waiting period was not a temporary appointment for several reasons, including that there was no indication that the Department of Justice contemplated Mitchell's job being short-term; Mitchell was appointed under the authority of 28 U.S.C. § 542 and applicable regulations indicated that a temporary appointment was limited to 1 year; and the 7 month period was not intended to asses Mitchell's abilities because she already served in a "same or similar" position prior. *Mitchell*, F.3d at 86. Kohler has none of the salient factors in common with Mitchell. Kohler was appointed under the Stafford Act as temporary personnel and from the beginning of Kohler's appointment, the temporary nature of her appointment was clear. The *Mitchell* holding therefore does not apply here.

Having concluded that Kohler's position was temporary, and she therefore does not have two years of continuous service under "other than a temporary appointment", the Court need not consider Kohler's other arguments on this matter. Kohler is not an "employee" in the meaning of § 7511(a)(I)(C)(ii). Accordingly, FEMA is entitled to summary judgment that the MSPB does not have jurisdiction over Kohler's appeal.

6.   Due Process Claim

Finally, the Court considers Kohler's argument that she was deprived of due process with respect to her termination. The Court also concludes FEMA is entitled to summary judgment on this claim.

"In order to establish a Fifth Amendment [due-process] . . . claim based on termination from employment, a plaintiff must make two showings. First, a plaintiff must demonstrate that [s]he has a 'property interest in continued employment.'" *Solomon v. Office of Architect of Capitol*, 539 F. Supp. 2d 347, 350 (D.D.C. 2008) (quoting *Orange v. Dist. of Columbia*, 59 F.3d 1267, 1274 (D.C.Cir.1995)). "Such property interests 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' Accordingly, '[t]o determine whether [a federal employee] had a property interest in continued employment, [courts] ask if he had a legitimate expectation, based on rules (statutes or regulations) or understandings (contracts, expressed or implied), that he would continue in his job.'" *Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988). "Second, a plaintiff must demonstrate that [s]he was deprived of the process [s]he was due." *Solomon*, 539 F. Supp. 2d at 350 (quoting *Orange*, 59 F.3d at 1274).

Kohler contends that "among other procedural deficiencies, [she] was not given notice and opportunity to be heard prior to her termination becoming effective, nor was she allowed to answer

the termination memorandum before its immediate implementation." Opp. at 39 n.17. While Kohler points out what process she believes she was due, she provides no argument for why she has a property interest in her FEMA position. The Court therefore concludes that FEMA is entitled to summary judgment on this issue was well.

CONCLUSION

For the reasons above, the Court GRANTS FEMA summary judgment as to all of Kohler's claims. The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

**Dated: April 2, 2020**

      **New York, New York**

      **ANDREW L. CARTER, JR.**

      **United States District Judge**